832 P.2d 743

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Bradley R. THOMASSON,
Defendant–Appellant.**

No. 18775.

Supreme Court of Idaho,
Boise, March 1992 Term.

May 13, 1992.

Knowlton, Miles & Merica, Lewiston, for appellant. Jeff M. Brudie, argued.

Larry EchoHawk, Atty. Gen., and Steven J. Tobiason, argued, Deputy Atty. Gen., Boise, for respondent.

McDEVITT, Justice.

## BACKGROUND

At approximately 5:30 a.m. on September 22, 1989, appellant telephoned "911" in Lewiston, Idaho. Appellant reported to the "911" operator that his parents, Ray E. Thomasson and Judith A. Thomasson, had been shot and appeared to be dead.

The Lewiston police arrived at appellant's home, arrested appellant, and transported him to the Lewiston Police Department. Shortly after arriving at the department, appellant was read his *Miranda* rights and questioned by Officer Alan Johnson. During this interview, appellant claimed not to know who shot his parents and he speculated that a robber had committed the murders.

Subsequent to the interview with Officer Johnson, appellant was again read his rights and questioned by Officer Russell Ellis. During the Ellis interview, appellant denied involvement with or any firsthand knowledge of the shootings. However, after a break late in the interview, appellant changed his story, stating that he saw who shot his parents and describing a man with a rifle near the window of the living room. Officer Ellis expressed doubt, telling appellant that he wanted to know why appellant had committed the murders. It was then that appellant admitted to shooting his parents.

### *Procedure*

On September 25, 1989, a criminal complaint was filed in the Second Judicial District Court of the State of Idaho against appellant. In this complaint, appellant was charged with two counts of first degree murder, in violation of I.C. §§ 18–4001, 18–4002, and 18–4003.

On September 25, 1989, the court appointed the firm of Knowlton, Miles & Merica to represent appellant. Appellant's attorney filed an affidavit on October 5, 1989, in which he stated that "premeditation and malice aforethought are the primary issues which will be tried, including the capacity of the [appellant] to premeditate" and re-quested the court to appoint Dr. Roger White as an expert psychiatrist.

On October 11, 1989, an amended criminal complaint was filed. In the amended criminal complaint, the State added a sentencing enhancement—possession of a firearm during the commission of a crime, in violation of I.C. § 19–2520.

On October 17, 1989, a criminal information was filed against appellant. The information contained the two counts of first degree murder, the sentencing enhancement, and a list of known witnesses.

On October 18, 1989, appellant was arraigned. At the arraignment, appellant pled "not guilty" to both counts of first degree murder. In addition, the court set dates for pretrial motions and the jury trial.

On November 2, 1989, appellant moved for a change of venue. The motion requested moving the cause from Nez Perce County, pursuant to I.C. § 19–1801 and I.C.R. 21, or, alternatively, selecting the jurors from another county, pursuant to I.C. § 19–1816. On January 15, 1990, the motion for a change of venue was granted to the extent that jurors would be empaneled from another county.

On November 3, 1989, appellant filed a motion to suppress certain evidence. Appellant requested suppression of statements he made to officers Alan Johnson and Russell Ellis on September 22, 1989, and a videotape of appellant taken at the crime scene on September 22, 1989. Appellant argued that the statements were not the product of his free and voluntary actions and were, thus, violative of Idaho and United States law. He contended that the videotape violated I.C. § 19–615. On January 15, 1990, the motion to suppress was denied. However, the videotape taken of appellant at the crime scene was rejected when offered in evidence.

On January 22, 1990, the State filed a notice of its intent not to seek the death penalty. The notice was based on the aggravating and mitigating circumstances, and the State requested the court to notify the jury of the State's intent not to seek the death penalty.

Also on January 22, 1990, the court ordered appellant transferred to the Ada County jail for the purpose of jury selection. Jury selection in Ada County began on January 23, 1990.

On January 25, 1990, the trial began. On January 31, 1990, an amended information was filed. The amended information contained the two counts of first degree murder and the sentencing enhancement of possession of a firearm during the commission of a crime. The next day, on February 1, 1990, the jury returned its verdicts. The jury found appellant guilty of both counts of first degree murder.

Sentencing proceedings began on May 1, 1990. After each side called its witnesses, the district court sentenced appellant to a minimum term of ten (10) years for each count of first degree murder, with each ten (10) year sentence to be served consecutively.

On May 10, 1990, the district court entered a judgment of conviction against appellant. In the judgment, the court stated that appellant "is guilty of the crime of Two Counts of MURDER IN THE FIRST DEGREE, I.C. § 18–4001, 18–4002, and 18–4003, a felony...." For each count, appellant was sentenced to "a term of LIFE, consisting of a minimum period of confinement of TEN (10) years during which the [appellant] shall not be eligible for parole or discharge or credit or reduction of sentence for good conduct (except as provided by Section 20–101D, Idaho Code) and a subsequent indeterminate term of custody of LIFE." Furthermore, the court stated that "the sentences ... shall run consecutive" and "[t]hat the total minimum term of confinement for Counts I and II combined shall be a period of TWENTY (20) years and a total subsequent indeterminate term of custody of LIFE."

Appellant filed his notice of appeal, pursuant to I.A.R. 11(c)(1) and (6), on June 20, 1990, appealing "from that certain Judgment of Conviction entered ... on the 10th day of May, 1990...."

The issues on appeal are:

I. Did the district court abuse its discretion in allowing Dr. Carl Koenen to testify regarding the positions of the victims' bodies at the time they were shot?

II. Did the district court err by not instructing the jury on the lesser included offense of voluntary manslaughter, as requested by appellant?

III. Did the district court abuse its discretion in ordering that the sentences imposed be served consecutively?

## ANALYSIS

### I.

#### DID THE DISTRICT COURT ABUSE ITS DISCRETION IN ALLOWING DR. KOENEN TO TESTIFY REGARDING THE POSITIONS OF THE VICTIMS' BODIES AT THE TIME THEY WERE SHOT?

At trial, the State called Dr. Carl Koenen for the purpose of testifying as an expert witness. During Dr. Koenen's testimony, the State asked if he had an opinion as to the position of each of the decedents at the time they were shot. Counsel for appellant objected to these questions. At trial, and on appeal, appellant contends that these questions were designed to elicit from Dr. Koenen testimony regarding how the deaths occurred rather than an expert medical opinion. Further, appellant argues that this testimony did not require special skills or knowledge beyond that possessed by ordinary citizens such as those comprising the jury.

This Court has stated that "I.R.E. 702 provides the appropriate test for determining whether an adequate foundation had been laid to admit the testimony of the expert witness regarding scientifically derived evidence." *State v. Rodgers*, 119 Idaho 1047, 1049, 812 P.2d 1208, 1210 (1991). Idaho Rule of Evidence 702 reads:

**Rule 702. Testimony by experts.**—If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"An expert witness has been defined by this Court 'as someone possessing a certain skill or knowledge which is beyond the competence of the average layman or juror.'" *Rodgers*, 119 Idaho at 1051, 812 P.2d at 1212 (citing *Potter v. Mulberry*, 100 Idaho 429, 599 P.2d 1000 (1979); *Stoddard v. Nelson*, 99 Idaho 293, 581 P.2d 339 (1978); *Bean v. Diamond Alkali Co.*, 93 Idaho 32, 454 P.2d 69 (1969)). It is within the discretion of the district court to determine whether a person is qualified to testify as an expert witness. *Rodgers*, 119 Idaho at 1051, 812 P.2d at 1212; *Jones v. Jones*, 117 Idaho 621, 627, 790 P.2d 914, 920 (1990).

■ Dr. Koenen testified that he was currently a physician specializing in pathology, that he had attended college at Kalamazoo College in Michigan and medical school at Marquette School of Medicine in Milwaukee, Wisconsin, and explained the difference between forensic and clinical pathology. He further stated that he was currently a licensed medical physician in Idaho, that he was certified by the American Board of Pathology, that he had devoted a substantial part of his practice to the area of forensic pathology over the past years, that he had been called upon a number of times in the past to testify as a forensic pathologist, that performing autopsies and determining locations of wounds were duties he had performed as a forensic pathologist, that he had performed the autopsies on decedents Ray E. Thomasson and Judith A. Thomasson, and that he had followed standard procedures in performing both of these autopsies.

Given Dr. Koenen's qualifications, experience, and the foundation laid for his testimony, this Court cannot say that the district court abused its discretion in allowing Dr. Koenen to testify as to the location of the victims' bodies when they were shot. *See Rodgers*, 119 Idaho at 1051–52, 812 P.2d at 1212–13. The testimony of Dr. Koenen, including the testimony regarding the position of the decedents' bodies at the time they were shot, is helpful, or of assistance, to the jury, as the finder of fact, in understanding the evidence at trial.

## II.

### DID THE DISTRICT COURT ERR BY NOT INSTRUCTING THE JURY ON THE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER AS REQUESTED BY APPELLANT?

After the close of his case, appellant requested the district court to instruct the jury on the lesser offense of voluntary manslaughter, as defined by I.C. § 18–4006(1). Instead, the district court instructed the jury on first degree murder and second degree murder. Appellant argues that the district court erred because the evidence was sufficient to support an instruction on voluntary manslaughter.

■ When a district court is requested to give an instruction on a lesser included offense, it must look to *all* of the evidence presented at the trial to determine if there is a reasonable view of the evidence to support the requested instruction. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992); *State v. Olsen*, 103 Idaho 278, 284, 647 P.2d 734, 740 (1982). Once the district court makes this discretionary determination, it must then look to the language of the proposed instruction and determine whether it is an erroneous statement of law or adequately covered by other instructions. *Fodge*, 121 Idaho at 195, 824 P.2d at 126; *Olsen*, 103 Idaho at 285, 647 P.2d at 741. However, if the district court makes the determination that there *is* a reasonable view of the evidence to support an instruction on the lesser included offense, then it *must* instruct the jury on that lesser included offense.

■ In this case, appellant brings before this Court a challenge to the district court's refusal to instruct the jury on voluntary manslaughter. However, we find ourselves unable to rule on whether the district court made the correct discretionary determination. This is because we do not have a complete record on appeal before us. Instead, we have a transcript of the sentencing proceedings, the pleadings and orders on file in the district court, a transcript of Dr. Carl Koenen's testimony, and

**176**

certain exhibits from trial. We do not have a complete transcript of the trial. In order for us to review and rule upon a district court's denial of a proposed instruction on a lesser included offense, we have to look to *all* of the evidence presented at the trial to determine if there is a reasonable view of the evidence to support the requested instruction. *Fodge*, 121 Idaho at 195, 824 P.2d at 126; *Olsen*, 103 Idaho at 284, 647 P.2d at 740 (1982). In this case, we reject this issue and accept the instructions as given by the district court. In *Lisher v. City and/or Village of Potlatch*, 101 Idaho 343, 612 P.2d 1190 (1980), wherein the appellant failed to request a reporter's transcript of the testimony offered at trial, we held that:

> Because no such transcript was provided, the factual findings of the trial court cannot be reviewed on appeal, *Baker v. Ore–Ida Foods, Inc.*, 95 Idaho 575, 585, 513 P.2d 627, 637 (1973); *Neer v. Safeway Stores, Inc.*, 92 Idaho 361, 365, 442 P.2d 771, 775 (1968), and we must accept them as valid. *See Beneficial Life Ins. Co. v. Wakamatsu*, 75 Idaho 232, 238, 270 P.2d 830, 833 (1954) [*overruled on other grounds, Downing v. Boehringer*, 82 Idaho 52, 349 P.2d 306 (1960)].

*Lisher*, 101 Idaho at 344, 612 P.2d at 1191.

### III.

### DID THE DISTRICT COURT ABUSE ITS DISCRETION IN ORDERING THAT THE SENTENCES BE SERVED CONSECUTIVELY?

At the conclusion of the sentencing proceedings, the district court sentenced appellant to two (2) consecutive fixed ten (10) year terms[1] to be followed by indeterminate terms of up to life in prison. Thus, at a minimum, appellant will spend twenty (20) years in prison. On appeal, appellant challenges this sentence. In particular, appellant challenges the reasonableness of the consecutive nature of his sentence.

[1] The minimum term of confinement for a person convicted of first degree murder in the state

"In reviewing the reasonableness of a sentence, we are exercising our authority as an appellate court to determine whether the trial court abused its discretion." *State v. Broadhead*, 120 Idaho 141, 143, 814 P.2d 401, 403 (1991) citing *State v. Wolfe*, 99 Idaho 382, 384–85, 582 P.2d 728, 730–31 (1978), *overruled on other grounds, State v. Brown*, 121 Idaho 385, 388, 825 P.2d 482, 485 (1992). Furthermore, in *Broadhead*, this Court stated:

> In *State v. Dillon*, 100 Idaho 723, 724, 604 P.2d 737, 738 (1979), the Court succinctly stated the standard we must follow in reviewing sentences:
>
> Sentencing is a matter committed to the discretion of the trial judge, and the defendant has the burden of showing a clear abuse thereof on appeal. In exercising that discretion, reasonableness is a fundamental requirement.

*Broadhead*, 120 Idaho at 144, 814 P.2d at 404; *Fodge*, 121 Idaho at 195, 824 P.2d at 126. As to the reasonableness of a sentence, we must ask "whether the sentence was excessive under any reasonable view of the facts." *Fodge*, 121 Idaho at 195, 824 P.2d at 126.

Our review of the record indicates that appellant was seventeen (17) years old when he murdered both of his adoptive parents. Additionally, the record reveals that appellant had previously been in trouble with the police.

Based on the record before us, we cannot say that the district court abused its discretion, and we therefore affirm the sentence of appellant.

For the above reasons, we affirm the decision of the district court in all respects.

BAKES, C.J., JOHNSON, J., and WINMILL, J., Pro Tem., concur.

BISTLINE, Justice, concurring in part, and dissenting in part.

### PART I

The opinion for the Court adequately and correctly informs as to the basic back-

of Idaho is ten (10) years. I.C. § 18–4004.

ground of this controversy. Likewise, it delineates the procedures which took place relative to prosecution, conviction, and imposition of sentence.

I see nothing amiss in what the opinion relates under Part I of the "Analysis," and see no need to agree or disagree, and comment only to the extent of noting that the prosecution's utilization of Dr. Koenen's expert testimony was unnecessary. Prior to the time that he was brought into the case the authorities were able to investigate to their own satisfaction and had obtained evidence to establish the occurrence of two homicides. Sergeant Ellis had in a professional manner obtained the appellant's confession. The parents were both dead, and the appellant admitted that he dealt the fatal shots, a clear case of homicides with Brad Thomasson being the person who should be charged. There were no other probable suspects.

The appellant, obviously reposing confidence in Sergeant Ellis, had furnished the authorities with a confession which provided the details of the incident, culminating in what appeared to be a rather severe confrontation involving the youth and the father. Then, in the aftermath, the mother was shot during a heated exchange which included her declaration that Brad would be sent to prison. Apparently in recognition of that naked truth the youth reacted with violence. Clearly all that happened could have been forecastable in light of the deterioration of the parent-child relationship.

## PART II

Turning to Part II of the opinion for the Court, there is much to which I am unable to subscribe. That with which I do readily agree is the statement which reads, "... if the district court makes the determination that there *is* a reasonable view of the evidence to support an instruction on the lesser included offense, then it *must* instruct the jury on that lesser included offense." 122 Idaho at 175, 832 P.2d at 746 (emphasis in original).

The majority opinion states that "we have a transcript of the sentencing pro-

ceedings, the pleadings and orders on file in the district court, a transcript of Dr. Carl Koenen's testimony, and certain exhibits from trial. We do not have a complete transcript of the trial." 122 Idaho at 175–176, 832 P.2d at 746–747. I readily agree that we do not have a complete transcript of the testimony presented at trial, and accordingly, "we do not have a complete record on appeal before us." *Id.* at 175, 832 P.2d at 746. But, that circumstance does not preclude the majority from ruling on Thomasson's contention that the district court erred in refusing to instruct the jury on the lesser included offense of voluntary manslaughter, as defined in I.C. § 18–4006.

Not presented by the majority is any reason for not having taken the appropriate action which would have resulted in our having a complete trial transcript. Where the Court sees that it does not have a complete transcript, as here, rather than bemoan the problem, the Court knows how to order augmentation of an appeal record and remedy that defect. So doing is not at all an unusual happening. *In this very case the Court has done so, sua sponte.*

The records in our clerk's office demonstrate that the Court ordered augmentation of the record on February 13, 1992, *but selectively omitted requesting those portions thereof which it now declares that we do not have,* now lamenting that "we find ourselves *UNABLE TO RULE* on whether the district court made the correct discretionary determination," (emphasis supplied) *i.e.,* whether the jury should have been instructed on manslaughter. In a case of this magnitude, the Court's failure to order a complete trial transcript amounts to an exercise of judicial *in* discretion. A copy of the Court's *sua sponte* order is attached hereto as Appendix A.

The Court should, if we are interested in achieving justice, immediately have the record on appeal supplemented with the trial transcript, and for the present withhold all opinions until the Court has obtained the remainder of the transcript and will no longer be unable to rule. Only in that manner can the Court remedy the in-

justice it appears to be dealing to young Brad Thomasson. He is as much entitled to a fair appellate review as was he entitled to a fair trial.

The Court has the authority to order such supplementation as it may direct. I.A.R. 44. Not known is *why* the Court, when it entered its prior order for a limited augmentation of the trial transcript, did not also order that the record be supplemented with a transcript of the entire trial proceedings. For certain highly unusual, the selective use of only portions of the transcript is intolerable in a review of a criminal prosecution for two counts of first degree murder.

The existence of the situation is attributable in large part to this Court's aforesaid directive to the clerk of the district court in Nez Perce County, which selectively required only certain portions of the reporter's transcript. The Court so functioned without this one member being informed as to the Court's action until it was a *fait accompli.*

### PART III

Supplementing the record with the trial testimony is necessary in order that this Court be able to perform its function of ascertaining that the appellant received a fair trial, meaning that no error occurred therein which was prejudicial to the appellant. In view of the above extenuating circumstances, it is equally required in the interests of justice. Moreover, following the completion of our review and the order affirming the trial court, it is as certain as night follows day that there will be the inevitable petition for post-conviction relief. The majority today will be casting the die, because, implicit in the augmentation procedures of which we all belatedly now have knowledge, will be the cry that it was for appellant's counsel to provide the reporter's transcript as part of the appeal record. Such post-conviction petition will additionally tax our already heavily burdened district court, attorney general's office, and public defenders, as well as causing unnecessary delay. As the late Chief Justice Shepard wrote, "Justice delayed is justice denied."

That is a philosophy of which we who follow must be ever mindful.

Further, what record we do have before us strongly suggests that the evidence presented, taken as a whole, supports the giving of instructions as to manslaughter. While it appears that appellant did admit to Ellis that he shot both his mother and father, equally true is it that the shooting of the father occurred as the byproduct of a heated confrontation between the appellant and his father, with his mother's unfortunate appearance on the scene after hearing the gun shots, all the while tempers and passion were high, and reason was non-existent. At the request of the police, appellant made a statement as to the episode, knowing that it was being taped and that his statement could be used against him. A transcript of a portion of that recorded statement is attached as Appendix B. Appellant's statement, which the jury heard and was at liberty to believe, was that during the quarrel his father struck him several times, and declared that appellant was nothing but trouble to the extent that he would be putting the boy away. Appellant also told the Ellis that he became angered on his father declaring his regret in having adopted him. The shots were fired shortly after that comment. Considering that appellant was an immature seventeen year old youth, and as well a very troubled person it would have been within the province of the jury to conclude under a reasonable view of this evidence, that appellant fired the shots "upon a sudden quarrel or heat of passion," a definition of voluntary manslaughter. I.C. § 18–4006(1).

Whether there was or was not sufficient evidence to support the jury's first degree murder verdict is not the issue upon which we focus our appellate inquiry. The issue presented to this Court is the defense contention that the district court committed reversible error in rejecting defense instructions on manslaughter. I.C. § 19–2132(b)(2). In so doing the district court usurped the jury's function: to decide the degree of the homicide. The jury was in that manner finessed out of knowing that a

homicide can be other than murder. The jurors might have comprehended that there were two degrees of murder, but not being in any way apprised as to the penalty, would have little regard as to which degree of murder upon which they would place their imprimatur of "guilty." Under I.C. § 19–2132(b)(2), a lesser-included instruction must be given even though the jury, under proper instructions would also be at liberty to weigh the evidence and conclude that the homicide did rise to the level of first degree murder. Simmered down to the bare essence, the issue before us, properly viewed, is the validity of a district court's ruling which, in practical effect, was *a directed verdict* on two counts of charged first degree murder.

The majority opinion, by avoiding a question that must inevitably be resolved, will cause an unwarranted expenditure of time, money, and effort, and will unnecessarily delay the final resolution of this cause, to the detriment of all involved.

### PART IV

Although the trial court did not err in instructing the jury as to the elements of first degree murder, and there is no such assertion by defense counsel, yet there remains good cause to question the validity of the court's decision ruling out the giving of the law relative to any of the lesser included homicide offenses which are not murder. Moreover, this was a trial where *there was no failure on the part of defense counsel to register a well stated objection* to the court's instructions which would be given to guide the jurors in their deliberations. Because that issue is of foremost importance, it is in order to unfold the discourse which involved the judge and defense counsel:

Your Honor, I believe it was the state's requested instruction number three that was the instruction upon malice and stated that malice may be express or implied. I think that has ultimately been incorporated into the court's instructions and I object to that on the basis that the malice definition is provided by statute in the Idaho Code and that

that instruction as submitted and given by the court does not contain the same definition of the word malice as is included within that instruction.

State's requested instruction number four which is also—has also been included within the instructions to be given by the court to the jury I believe is confusing and does not accurately state the law. I believe that instruction was meant to be directed towards the single element of premeditation while the beginning of the instruction makes reference to all three separate elements, willful intent, deliberation and premeditation and intends to lump those altogether as one element through the subsequent definition that as I say I believe was included by the court as a definition in regards to the element of premeditation.

In regards to the state's instructions that were submitted today I had the state's instructions submitted yesterday going through instruction number thirteen, Your Honor. What I have as state's requested instruction number fourteen is a—another definition of premeditated meaning merely thought beforehand.

It goes on to incorporate the element of intent to kill if entertained but for a moment is sufficient for premeditation and there need be no appreciable space of time between the intention to kill and the act of attempted killing.

I also would object to that as not being an accurate statement of the law and again serves to confuse the jury by combining what are separate elements of the offense into one.

What I have as state's requested instruction number sixteen is that which I had already previously addressed, Your Honor, in regards to what I had as state's requested instruction number four. That instruction is again in regards to the statement requiring the willful intent, deliberation or premeditation exists for any particular length of time before the crime is committed. It is sufficient if it appears from the evidence beyond a reasonable doubt that there was design and determination to kill dis-

tinctly formed in the mind of the defendant any moment before the killing took place.

I had previously stated my objection to that, Your Honor. I think it is also cumulative based on the other instructions the court is giving in regards to those particular elements.

That's the extent of my objections on instructions that the court intends to give, Your Honor.

I would also state an *objection in regards to the court's refusal to instruct upon the lesser included offense of voluntary manslaughter.*

There were instructions submitted by the defense setting forth not only the offense of second degree murder as a lesser included offense but also the offense of voluntary manslaughter. Voluntary manslaughter being defined as an unlawful killing without malice and upon sudden quarrel or heat of passion.

I believe the evidence that has been submitted in this case is present where if the jury chose to believe those particular items of evidence that the—there exists sufficient evidence to justify the court's giving of the ... various instructions on the offense of voluntary manslaughter as were submitted by the defendant and would *object to the court's not including any instructions on the lesser included offense of voluntary manslaughter for both count one and count two and the accompanying instructions defining the elements of voluntary manslaughter and including the instructions defining what will constitute heat of passion,* which was defendant's requested instruction number 19.

The instructions as the court now intends to give them contain no reference of any kind to the offense of voluntary manslaughter as were requested in numerous of the instructions submitted by the defense in this matter and I would object to the court's non giving of those instructions.

THE COURT: Thank you Mr. Brudie. With regard to your objections just briefly, commenting on those. First with regard to the definition of malice. Of those submitted to the court it appears that the definition that's going to be given is the easiest to understand, and is an improvement which does not change the meaning of the definition contained within the statute.

There is some duplication in the instruction,—in the instructions that's difficult to avoid. I felt the duplication was necessary in order to instruct as to give the jury a complete picture as to the law involved in this case.

With regard to the court refusing to give the definition or refusing to submit to the jury the lesser included offense of voluntary manslaughter, *it is my opinion that there is not sufficient evidence in the record to support a verdict of voluntary manslaughter in that if the jury believes and finds the defendant guilty of anything it's going to have to be murder either in the first or second degree.*

With the facts that are before the court there is—there is no basis from which a jury could find the defendant guilty of voluntary manslaughter. The facts would not support an interpretation that the—if the jury finds the killings took place from all of the evidence that has been submitted if the killings took place at the hand of the defendant and from—if the jury chooses to find the defendant guilty of any crimes I cannot—*cannot see a set of facts that will support a finding that there was not malice involved in the killings.*

There was not a—there—*it was not a situation where there was a sudden quarrel or heat of passion.* Even the statement which was heard by the jury indicated that there was some period of time between the end of any quarrel and the time that the shots were fired. The defendant's own version is that there was discussion back and forth between the—between Ray Thomasson and himself before the shot was fired. And there—all indications and inferences are that that shot was not the fatal shot, that the fatal shot was fired at a later time and certainly *the evidence* which would

support a verdict of guilty of the defendant as to Judith Ann Thomasson *did not indicate any set of facts which would support a finding that that killing took place upon a sudden quarrel or heat of passion.*

I can't justify in my own mind submitting that—that lesser included offense to the jury and it's my determination that the only lesser included offense that would be submitted to the jury is that of murder in the second degree.

R. Augmentation, 8–14 (emphasis added).

Comment is in order in regard to three instructions submitted to the court *by the prosecution,* none of which were given. The shortest of the three reads:

### INSTRUCTION NO.___

YOU ARE INSTRUCTED THAT VOLUNTARY MANSLAUGHTER is the intentional and unlawful killing of a human being without malice aforethought.

There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion.

That language is beyond reproach, and would have the immediate effect of informing the jury the part played by malice aforethought, *i.e.,* presence of malice is essential to proving a charge of murder. More importantly, the jury would know that a homicide which arises out of a *sudden quarrel or heat of passion* excludes malice aforethought from consideration.

A second instruction requested by the prosecution is both definitive and instructive, and which would have informed the jury as to what constitutes the "heat of passion" which will reduce a homicide from murder to manslaughter:

### INSTRUCTION NO.___

The heat of passion which will reduce a murder to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable man faced with the same situation. The basic inquiry is whether, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.

The identical instruction was submitted to the court as Defendant's Requested Instruction No. 19. That instruction could not but have had considerable impact upon the jury, *had* it been given. Where both parties requested the same instruction, it is not understood why the court did not submit it to the jury. The only apparent reason is the trial court's self-determination that the jury would be given two, and *only two* options of a returnable verdict: first degree murder or murder in the second degree.[2]

The State also submitted voluntary manslaughter instructions as to both Count I and Count II:

### INSTRUCTION NO.___

A charge of MURDER IN THE FIRST DEGREE also includes the lesser charge of VOLUNTARY MANSLAUGHTER. The material elements of the lesser offense of VOLUNTARY MANSLAUGHTER for Count I are:

1. That the defendant did wilfully, unlawfully, knowingly, intentionally and feloniously kill one Ray E. Thomasson [and Judith A. Thomasson];

---

**2.** There may be some precedential Idaho case law which authorizes a trial judge to make the determination that where an accused has been involved in a homicide, the jury must find him guilty of first degree murder or guilty of second degree murder. I confess to not being aware of such authority, and am not enthused with the notion that the time has now come to manufacture such authority.

2. That the defendant acted without malice;

3. That the act was a result of a sudden quarrel or heat of passion;

4. That the act was committed on or about September 22, 1989, in Nez Perce County, State of Idaho.

In sum, I am able to agree with the majority as set forth in part I of my opinion, but because this Court is "unable to rule because we do not have a complete record" I must dissent in large part to the majority opinion. The record presented to us prior to our making a ruling should be complete, and, if not, we should immediately have the record on appeal supplemented. With the prosecution and the defense requesting identical instructions on the most pivotal issue involved in this controversy, it is not in the least inappropriate to suggest that the trial court should have given more consideration to instructing the jury as both the prosecution and defense requested.

Moreover, had the court not boxed the jury out of reaching a verdict of manslaughter, the jury very well might have reached a verdict which was *not* voluntary manslaughter. The jury was denied that opportunity. Yet, this is Idaho, part of the United States of America, wherein it has forever been believed that trials are *the* proper forum to resolve allegations of criminal wrongdoing, and, correspondingly, that juries of one's peers make the final determination of the degree of the crime under the proven facts.

## APPENDIX A

In the Supreme Court of
the State of Idaho

State of Idaho, Plaintiff–Respondent,

v.

Bradley R. Thomasson, Defendant–
Appellant.

### ORDER AUGMENTING RECORD

### NO. 18775

This appeal is scheduled for argument March 12, 1992. The Court has determined that certain documents and sentencing transcripts should be included in the Appeal Record before the Court. Therefore, good cause appearing,

IT IS HEREBY ORDERED that the District Court Clerk shall file the documents listed below with this Court as EXHIBITS at the time of filing the SUPPLEMENTAL REPORTER'S TRANSCRIPT:

1. ALL JURY INSTRUCTIONS OTHER THAN THOSE INSTRUCTIONS WHICH WERE FILED WITH THIS COURT IN ACCORDANCE WITH THE COURT'S ORDER FOR AUGMENTATION, issued December 28, 1991.

IT IS FURTHER ORDERED that the District Court Reporter shall prepare and lodge with the District Court Clerk a SUPPLEMENTAL REPORTER'S TRANSCRIPT of the proceedings listed below within seven (7) days from the date of this Order which shall be filed with this Court immediately upon lodging and the District Court Clerk shall serve a copy on counsel for the parties:

1. TRANSCRIPT OF SENTENCING HEARING, held May 1, 1990.

IT IS FURTHER ORDERED that any corrections to the transcript of the sentencing hearing shall occur as provided by Appellate Rule 30.1 and no settlement proceedings shall be held in the District Court due to the scheduling of oral argument in this appeal.

DATED this 13th day of February, 1992.

By Order of the Supreme Court
/s/ Frederick C. Lyon
Frederick C. Lyon, Clerk

cc: Counsel of Record

cc: District Court Clerk

cc: District Judge Ronald Schilling

cc: Reporter D. Howell

## APPENDIX B

The following is a partial transcript of the taped statement made by Brad Thomasson to Sergeant Russell Ellis, of the Lewiston Police Department, on September 22, 1989, wherein Brad admits he shot his parents. The shootings took place at approxi-

mately 5:30 a.m., and this interview took place later that same day:

Ellis: You say you're hungry, you know we don't want you sitting here being hungry and things like that. We want to take care of you. You're just a child. You're a kid. You're seventeen years old.

Brad: I'm gonna go to prison.

Ellis: Why did you do it?

Brad: I was talking to 'em, and my mom said something and I said something back. And my dad said well you can't use the car today. And I said: Why? I've done everything I was supposed to. And he said: I don't like the way you talk to your mother. I said: I didn't say anything wrong God-dammit. And he said: Don't you cuss. And then he got out of bed, and we started to fight. He hit me.

Ellis: Where'd he hit you Brad, where'd he hit you?

Brad: He just hit me in the stomach.

Ellis: Okay.

Brad: So I went down, and ran to my bathroom and I told him to stay away from me. He came after me. I shoved him. He shoved me back. He hit me again in the stomach. I shoved him again. I had my twenty-two sittin' in the corner of my bathroom. I had been out and I had been out shootin' with it before. I grabbed it. I told him to stay away from me. And he kept on comin' so I, I just pulled the trigger. I didn't mean to. I just did it.

Ellis: I know.

Brad: I killed my parents.

Ellis: Why did you shoot your mother?

Brad: She was calling the police. I didn't know what to do. She started comin' up to me and she was gonna get the gun out of the drawer.

Ellis: It's okay.

Brad: And I just ...

Ellis: Let's put this up.

Brad: I'm a fuckin' psycho.

Ellis: It's okay.

Brad: I killed my parents.

Ellis: I know you did.

Brad: God.... I'm going to prison. I'm seventeen.

....

Ellis: What time did you shoot them?

Brad: I'm not quite sure of the time. Got up at five and I went in and talked to them in their bedroom and we got in an argument. My dad started hitting me and stuff and I started pushing him and shoving him, trying to hit him back. [inaudible] up near my, down by my bathroom.

....

Ellis: They were in their bedroom?

Brad: They were in bed.

Ellis: Were they awake?

Brad: Yeh, getting there. They were just getting up. And I started talking to them. And I got in an argument with them.

Ellis: With who?

Brad: My dad.

Ellis: Did you get in an argument with your mother? Who was the argument really with? Who was—

Brad: My dad.

Ellis: Okay.

Brad: He didn't like something I said to my mom. And I said I didn't say anything wrong. And, and he got up and said I'm sick of you. You cause nothing but trouble. And he hit me.

Ellis: Where did he hit you at?

Brad: In the stomach.

Ellis: Did, uh. How many times?

Brad: Just once.

Ellis: Okay.

Brad: I shoved him, and I, I started running. And he said come back here you little bastard, I'm gonna get you.

Ellis: I'm gonna what?

Brad: I'm gonna get you. So—

Ellis: Okay wait a minute. Did, did your dad beat you a lot? Did he hit you a lot? Is this the—

Brad: Never.

Ellis: First time. Is this the first time?

Brad: I mean he's gotten mad and hit me before but never like this. He's never been this mad.

Ellis: Why was he mad?

Brad: I don't know.

Ellis: Okay. You said earlier that you were supposed to use the car.

Brad: Yeh.

Ellis: They told you you couldn't use the car.

Brad: Yeh.

Ellis: Who? Your mother or your ...

Brad: My dad. I said, well why, I've done everything I'm supposed to. I've been doing real good. And he said I don't want to hear any excuses. I said I'm not giving you excuses. My mom said that's all you ever give is excuses. And I said something like shut up or something like that. And my dad said don't you talk to her like that, she deserves better. And I said I haven't done anything wrong. He said yes you have, I don't like the way you talk to her, apologize. I said I didn't do anything wrong. Then he said something like well you've caused nothing but trouble here. I said well maybe I should just leave. He said well maybe you should. And I said okay fine I'll leave. He said well fine, don't take anything with you. I said I bought most of my stuff. And he said oh no you didn't I said well just watch me, I'm gonna take it. So he got up and he hit me. I shoved him after he hit me. And I started to go down the hall. He came after me and he started calling me names saying I cause nothing but trouble, and that was the reason they, that they would have to sell the house, that they should've just let me go to the boys ranch. Said they never should've adopted me. I got mad when he said they should've never adopted me. I said I've done a lot of things right, um, more than I've done wrong. And he said not really. And I said well name one thing. And he got mad and he hit me again.

Ellis: Where did he hit you?

Brad: In the stomach.

Ellis: How many times did your dad hit you in the stomach? Altogether.

Brad: About four.

Ellis: Four times. Is your stomach sore now?

Brad: No.

Ellis: Do you have any bruises on your stomach?

Brad: No, it doesn't hurt.

Ellis: Doesn't hurt. Do you feel okay? Okay. Did you, where did you get the gun?

Brad: I had the gun out because the day before I had been cleaning it and I put bullets in it because I was gonna to go shootin' one of these days this weekend. I just grabbed the gun and I was gonna hit him with it. He said well what are you gonna do with that, shoot me? I said well maybe I will and maybe I won't. He said well I don't think you have guts enough. And I didn't mean to, I just pulled the trigger.

Ellis: How many times did you shoot your dad?

Brad: [inaudible], then I just cocked it and I shot him again.

Ellis: Where did you shoot him?

Brad: Again.

Ellis: Wait a minute Brad. You're going to fast for me. The first time that you shot your dad where did you shoot him at?

Brad: I think it was in the head or in the arm or, it was right up in here.

Ellis: Then you, is it a lever action gun? Twenty-two rifle? And then you cocked it again and put another shell in it? And you shot him when he was still standing up the second time or on the ground?

Brad: He was on the ground.

Ellis: He was on the floor. In the hallway?

Brad: Yep.

Ellis: Where we found him?

Brad: Uh huh.

Ellis: And you put the barrel down by his head and pulled the trigger again?

Brad: I was standing about three feet away. I just cocked it and shot it.

Ellis: Where did you shoot him at?

Brad: I think I shot him in the head. I was just kept on—

Ellis: How many times did you shoot your dad?

Brad: I don't know, I just kept on doing it.

Ellis: Okay wait a minute. Take a deep breath Brad. Listen to me, take a deep breath. Take a deep breath. Okay. You shot your dad a couple times, in the head.

Brad: A few times I think. I don't know.

Ellis: Okay, one time you shot him up towards the body, upper body of the head. He fell down?

Brad: He was kinda leaning against the wall and he's on his knees and I came out of the bathroom and I said I'm sorry, I didn't mean to. And, he said well you're gonna, you're in trouble for this. He was still standing. And then he fell down. And I was scared, I just did it again.

Ellis: You shot him again?

Brad: I shot him again.

Ellis: How much time between the two shots? A minute? Two minutes?

Brad: Wasn't that, I just—

Ellis: What were you doing in the bathroom?

Brad: I backed in there when he was coming after me. And I came out of there after I shot him the first time. And then I shot him again. And I don't know how many times I shot him.

Ellis: Okay.

Brad: I just, I couldn't stop. He was just—

Ellis: You were mad, upset. Right? Because they wouldn't let you take the car to school today.

Brad: No, because he was attacking me, and I didn't do anything wrong.

Ellis: Because he hit you in the stomach?

Brad: He was going to send me to a boys ranch.

Ellis: Okay, listen to me Brad. Why did you shoot your mother?

Brad: She came out and she said well you're gonna go to prison for this. I said I don't wanna go to prison. I didn't

mean to. She said you shut up or I'll [inaudible]

Ellis: You did what?

Brad: You shot him more than once. I said I'm sorry, I didn't mean to. She said well I'm gonna shoot you. So she went in the bedroom, I ran after her and I shot her. And she was twitching and I shot her again.

Ellis: Where did you shoot your mother at?

Brad: I shot her in the head.

Ellis: Did you walk right up to her and put the barrel in, by her head when you pulled the trigger?

Brad: I was about two feet away. I just put it up to her head and I just pulled the trigger.

Ellis: How many times do you think you shot your mother?

Brad: I think twice.

Ellis: Didn't you say earlier that you thought she was calling the police?

Brad: That's what I thought. When she went back in the bedroom.

Ellis: Now you're saying she was gonna, you're saying that she said she was gonna shoot you?

Brad: She, she yelled something back as she was going in the bedroom. She said well I'm gonna get a gun. And then I ran in there and I shot her.

NOTE: APPENDIX A NOT ON DISK. SEE HARDCOPY