908 P.2d 566

STATE of Idaho, Plaintiff–Respondent,

v.

Gene Allen FAUGHT, Defendant–
Appellant.

No. 21296.

Supreme Court of Idaho,
Boise, September, 1995 Term.

Dec. 19, 1995.

874

Alan E. Trimming, Ada County Public Defender, Steve Botimer, Deputy Public Defender, Boise, for appellant. Steve Botimer argued.

Alan G. Lance, Attorney General, Myrna A.I. Stahman, Deputy Attorney General; Catherine Derden, Boise, for respondent. Catherine Derden argued.

SCHROEDER, Justice.

## NATURE OF THE CASE

This is an appeal from a conviction and sentence following a jury trial. The appellant challenges the trial court's admission of statistical probability evidence that the appellant was the perpetrator of the rape based on comparison of DNA evidence, the sufficiency of the remainder of the evidence to support the jury's verdict, and the propriety of the sentence imposed.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

On September 23, 1993, the appellant, Gene "Gino" Allen Faught (Faught), was charged pursuant to subsections (1) and (4) of section 18–6101 of the Idaho Code (1987) (current version at Supp.1995)[1] with raping his fourteen-year-old stepdaughter, (JW). A jury trial was subsequently held in March of 1994.

JW testified that Faught telephoned her on September 9, 1993, and asked her to meet him the next afternoon in Boise's Veterans Park. JW went to Veterans Park to meet Faught the next day after school. At her request, several friends followed her at a distance to keep an eye on her. JW and Faught met and sat together on a bench for a period of time. JW inhaled "two hits" from a marijuana joint Faught offered her and agreed to go for a walk with him. JW's friends left, assuming everything was okay.

---

1. **18–6101. Rape defined.**—Rape is an act of sexual intercourse accomplished with a female under either of the following circumstances:

(1) Where the female is under the age of eighteen (18) years.

. . . .

(4) Where she is prevented from resistance by threats of immediate and great bodily harm, accompanied by apparent power of execution; or by any intoxicating, narcotic, or anaesthetic substance administered by or with the privity of the accused.

JW testified that she and Faught came to a dirt road alongside a canal which they walked down until they came to an area of bushes. According to JW, Faught pulled her into the bushes and forced her to perform and submit to a variety of sexual acts, including intercourse against her will. After voices were heard coming from the nearby path, JW testified that Faught made her get dressed and threatened to strangle her with her shirt if she made any noise. JW testified that Faught then took her to the men's bathroom where he raped her again. She faked an asthma attack and convinced Faught to let her go to a friend's house to get an inhaler.

Once free from Faught, JW testified that she ran to a friend's apartment and told him and others what happened. Thereafter JW revisited the scene of the alleged rape with Officer Greg Eisenbeiss of the Boise Police Department. On her way to the hospital emergency room JW and her mother spotted Faught outside a nearby convenience store, where he was subsequently arrested.

Hospital personnel in the emergency room at St. Alphonsus Regional Medical Center took various evidentiary samples from JW, including mucous swabs and blood, and she was examined under an ultraviolet "Wood's" lamp by Dr. William Martin for evidence of semen. Subsequently, blood, saliva, and hair specimens were taken from Faught at St. Alphonsus Regional Medical Center.

An emergency room nurse from St. Alphonsus Regional Medical Center testified at trial concerning the statements JW made the night of the alleged rape. The testimony regarding JW's account of the events closely tracked that of JW at trial. The nurse also testified that she found a small bruise on the inside of JW's arm and small abrasions on her back. The testimony of two Boise police officers regarding JW's contemporaneous account of the events of September 10, together with their investigative observations, was consistent with JW's trial testimony. The emergency room physician who examined JW on the night of the alleged rape, testified that she exhibited numerous bruises and scratches, and there was evidence of forced penetration.

Based on testimony given outside the presence of the jury, Harold Deadman, a Federal Bureau of Investigations supervisory agent, was allowed to testify regarding DNA testing that was conducted on evidentiary samples taken from JW and Faught. He testified that one test of the vaginal swabs and vulvar swabs taken from JW produced a "one in 75 match" with Faught's DNA; a second test proved inconclusive; a third test produced a "one in 218" match between the DNA in the vulvar swab and Faught's DNA; and, a fourth test was inconclusive. He stated that the raw statistical probability for the combined matches was "something like one in 30,000" for the entire population, but because the tests were of semen samples the possibility of a female source was eliminated, resulting in a combined match probability of about one in 60,000. Further, the inconclusive tests did not exclude a match with Faught's DNA.

Faught did not testify, and the defense called no other witnesses. The jury subsequently returned a guilty verdict, finding Faught guilty of rape pursuant to subsections (1) and (4) of I.C. § 18–6101. He was sentenced to life in prison with 15 years fixed and credit for 218 days served. He appeals the conviction and sentence.

## II.

### THE DISTRICT COURT PROPERLY ADMITTED DNA EVIDENCE LINKING THE DEFENDANT TO THE CRIME

■ Idaho Rule of Evidence 702 provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The admission of expert opinion testimony pursuant to I.R.E. 702 is reviewed on appeal under an abuse of discretion standard. *State v. Crea,* 119 Idaho 352, 353, 806 P.2d 445, 446 (1991).

■ This Court has previously rejected the so-called *Frye* rule for analyzing the admissibility of scientific evidence. The *Frye* rule derives from *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and has been interpreted to establish a *per se* rule, conditioning "the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed." *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 251, 723 P.2d 1354, 1362 (1982), *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982). *State v. Crea* rejected the *Frye* standard for determining the admissibility of Intoximeter 3000 test results. 119 Idaho at 355, 806 P.2d at 448. In *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984), this Court rejected the *Frye* standard for determining the admissibility of hypnotically refreshed testimony. *Id.* 106 Idaho at 623–25, 682 P.2d at 576–78. Some question may have existed for a period of time in light of the plurality opinion in *State v. Garrett*, 119 Idaho 878, 879–81, 811 P.2d 488, 490–92 (1991), in which the Court considered the admissibility of a horizontal gaze nystagmus (HGN) test. Two Justices analyzed admissibility in terms of the *Frye* test. However, two of the remaining three Justices concurred only in the result, and Justice Boyle specifically noted that in *Crea*, "we expressly declined to adopt the *Frye* criterion as the basis for admission of scientifically derived evidence as it related to the facts of that case." *Id.* 119 Idaho at 883, 811 P.2d at 493. Justice Johnson's dissent cited to *Iwakiri*, *Crea*, and Rule 702 as representing the Court's standards for admitting new scientific evidence, noting the Court's previous rejection of the *per se* rule of *Frye*.

In *State v. Gleason*, 123 Idaho 62, 844 P.2d 691 (1992), the Court again addressed the appropriate test for admitting scientific evidence, commenting on the plurality opinion in *Garrett*. "It is authoritative on the issue of the scientific reliability of HGN test evidence, however it is not authority for the appropriate test against which such scientific reliability is to be measured." *Id.* 123 Idaho at 65, 844 P.2d at 694. The Court concluded that, "This Court reaffirms that the appropriate test for measuring the scientific reliability of evidence is I.R.E. 702." *Id.* (footnote omitted).

Justice Bistline's dissent in *Gleason* makes it clear that the Court did reject the *Frye* standard and the plurality opinion in *Garrett* to the extent that it might be read as adopting the *Frye* standard. Rather, the Court in *Gleason* followed the reasoning of *Crea*. This is consistent with *State v. Rodgers*, 119 Idaho 1047, 1049, 812 P.2d 1208, 1210 (1991), decided shortly after *Garrett*:

Rodgers asserts that blood spatter interpretation has not generally been accepted within the scientific community and therefore, under the *Frye* test, the trial court erred by allowing the two witnesses to testify. However, in *State v. Crea*, 119 Idaho 352, 806 P.2d 445 (1991), we recently "decline[d] to adopt the *Frye* criterion as the basis for the admission of scientifically derived evidence" with regard to the admissibility of testimony regarding the accuracy of an Intoximeter in a DUI case. Instead, in *Crea*, we emphasized that I.R.E. 702 provides the appropriate test for determining whether an adequate foundation had been laid to admit the testimony of the expert witness regarding scientifically derived evidence.

In *Crea*, the Court held that the admissibility of scientific evidence is governed by the Idaho Rules of Evidence and the opinions of the Court. *Crea*, 119 Idaho at 355, 806 P.2d at 448. In upholding the trial court's admission of the Intoximeter test results the Court noted that an adequate foundation was laid to qualify the expert who testified as to the test results. An adequate foundation was likewise laid regarding the test procedures, and the district court considered extensive evidence from both parties as to the reliability and accuracy of the Intoximeter 3000. *Id.* at 354–55, 806 P.2d at 447–48. Further, the Court noted that it had previously ruled that "any deficiencies in the accuracy of the measurement of ethyl alcohol that are occasioned by the lack of a Taguchi cell may be attacked by cross-examination or by independent evidence." *Id.* at 354, 806 P.2d at 447 (citing *State v. Wilson*, 116 Idaho 771, 774, 780 P.2d 93, 96 (1989)).

Faught does not challenge Dr. Deadman's qualifications as an expert regarding DNA. Rather, he argues that Dr. Deadman's testimony regarding the statistical probability of another male having the same DNA as Faught was not based on sufficiently reliable scientific evidence, and consequently the probative value of the testimony was outweighed by its prejudicial effect.

■ Dr. Deadman testified at length outside the jury's presence regarding the Federal Bureau of Investigation's DNA testing procedures in general, as well as those used in this case. In particular he testified about the F.B.I.'s procedures for determining the frequency of the DNA analyzed in a given case occurring at random. On direct examination he testified that the F.B.I.'s statistical probability theories for determining the frequency of a random DNA match are generally accepted in the relevant scientific community. Under cross-examination he testified that while there is some dispute regarding the reliability of the databases the F.B.I. uses to determine random match frequencies, the dispute was primarily centered in the courtroom rather than in the scientific community. There was no evidence offered to challenge the reliability of the F.B.I. databases.

■ Following Dr. Deadman's testimony, the trial court noted that there was no apparent dispute as to Dr. Deadman's qualifications as an expert witness on DNA testing. Next the trial court considered whether the statistical basis used by the F.B.I. in determining the frequency of a random DNA match met the evidentiary standard of reliability. Based on the evidence presented, the trial court concluded that the F.B.I.'s theory of DNA matching was generally accepted by the relevant scientific community. The trial court then considered whether, pursuant to I.R.E. 403, the probative value of the DNA statistical probability evidence was outweighed by the danger of prejudicing or confusing the jury and concluded that, while the evidence was unquestionably prejudicial, it was not unfairly so. Finally, the trial court concluded that, "The statistical theory, although it may not be known to a certainty, it certainly meets the requisite standard of evidentiary reliability." This conclusion is supported by the record.

Faught has not met his burden of establishing that the admission of the statistical probability DNA evidence was an abuse of discretion.

## III.

## THE SUFFICIENCY OF THE EVIDENCE TO CONVICT THE DEFENDANT IS PROPERLY BEFORE THE COURT

The defense did not challenge the sufficiency of the evidence at trial by a motion for judgment of acquittal before submission of the case to the jury or after the jury returned its verdict. See Idaho Criminal Rule 29(a) and (c). This raises the question of whether that issue was preserved for appeal.

Faught did not offer evidence at trial. He put the State to its proof to determine if it could establish guilt beyond a reasonable doubt. The challenge to the sufficiency of the evidence is not based on a technical or subtle defect. The defense simply says that there was not enough admissible evidence to convict the defendant. Idaho Criminal Rule 29(a) provides that the trial court can address this issue on the motion of the defendant or upon its own motion prior to the submission of the case to the jury. The trial court made a finding prior to sentencing that there was sufficient evidence to convict Faught without the DNA evidence.

■ Recently the Court of Appeals held that a criminal defendant need not move for a directed verdict or judgment notwithstanding the verdict in order to preserve for appeal the issue of whether there was sufficient evidence before the jury to support a verdict to convict. *State v. Ashley,* 126 Idaho 694, 889 P.2d 723 (Ct.App.1994). In its order denying Ashley's petition for rehearing, the Court of Appeals rejected the State's argument that this Court's holding in *State v. Watson,* 99 Idaho 694, 587 P.2d 835 (1978), stands for the rule that a defendant's failure to object to the sufficiency of the evidence at trial precludes him from raising the issue on appeal. The Court of Appeals analyzed *Wat-*

*son* to hold that a defendant who puts on evidence after the trial court denies his motion for a directed verdict waives his right to limit an appellate court's review of the sufficiency of the evidence to the evidence presented at the close of the State's case. *State v. Ashley,* Docket No. 21254, Order Denying Petition for Rehearing, p. 2.

The Court of Appeals' reading of *Watson* is correct. This Court did not refuse to review Watson's challenge to the sufficiency of the evidence but held that any deficiency in the State's case regarding the perpetrator's identity was cured by Watson's subsequent testimony admitting that he had sexual intercourse with the victim. This is consistent with *State v. Erwin,* 98 Idaho 736, 572 P.2d 170 (1977), in which this Court reviewed the sufficiency of the evidence despite the fact that the defendant, like Watson, failed to renew his motion for acquittal at the close of all the evidence. *Id.* at 740–41, 572 P.2d at 174–75.

## IV.

## THE EVIDENCE PRESENTED WAS SUFFICIENT TO SUSTAIN FAUGHT'S CONVICTION

■ The evidence in this case of Faught's guilt is overwhelming. Witnesses observed him leave with JW to a secluded area. JW testified that Faught had multiple acts of sexual intercourse with her by use of force and threats against her will. She was fourteen years old. Subsequently, witnesses testified to her demeanor and her statements which were consistent with a person who had been raped. There was abundant medical evidence consistent with JW's version of the events. The trial court found that, aside from the DNA evidence, the evidence of guilt was "overwhelmingly clear." That conclusion is supported by the record.

## V.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN SENTENCING

■ This Court treats the fixed portion of a sentence as the term of confinement for purposes of appellate review. *State v. Book,*

127 Idaho 352, 354, 900 P.2d 1363, 1365 (1995). In the present case, the trial court imposed a life sentence with 15 years fixed. The crime of rape is "punishable by imprisonment in the state prison not less than one (1) year, and the imprisonment may be extended to life in the discretion of the District Judge, who shall pass sentence." I.C. § 18–6104. Faught's sentence is within the statutory parameters. The appellant has the burden of proving that it is unreasonable. *Book,* 127 Idaho at 354, 900 P.2d at 1365. When reviewing the reasonableness of a sentence, this Court determines whether the trial court abused its discretion. *Id.;* I.C. § 18–6104. The reasonableness of a sentence is determined by looking at the probable length of confinement. *State v. Wersland,* 125 Idaho 499, 503, 873 P.2d 144, 148 (1994). In reviewing a sentence imposed under the Unified Sentencing Act, the minimum period specified by the sentencing judge is treated as the probable duration of confinement. I.C. § 19–2513; *State v. Beatey,* 123 Idaho 273, 275, 846 P.2d 924, 926 (Ct.App.1993).

■ When imposing sentence in a criminal proceeding, the trial court applies the following criteria: (1) the protection of society; (2) deterrence to the defendant and others; (3) the possibility of rehabilitation; and (4) punishment or retribution. *Book,* 127 Idaho at 354, 900 P.2d at 1365. This Court's general objectives when reviewing a trial court's sentencing are:

(1) to correct the sentence which is excessive in length, having regard for the nature of the offense, the character of the offender, and the protection of the public interest;

(2) to facilitate the rehabilitation of the offender by affording him an opportunity to assert grievances he may have regarding his sentence;

(3) to promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process; and

(4) to promote the development and application of criteria for sentencing which are both rational and just.

*Id.* at 354–55, 900 P.2d at 1365–66.

■ Applying these standards to this case, the trial court did not abuse its discre-

tion. Based on Faught's five prior felony convictions and the seriousness of the offense, the trial court rejected Faught as a candidate for probation. The trial court then considered the three sentencing criteria cited in *Book:* protection of society, deterrence, and retribution, along with the proportionality of the sentence to the crime, the defendant's background, and sentences in similar cases. The trial court specifically noted that it did not consider Faught's "longstanding alcohol problem" a mitigating factor. Although inclined to impose a tougher sentence than the life sentence with 15 years fixed that the State recommended, the trial court ultimately accepted the State's recommendation, crediting Faught with the time served since his incarceration on September 10, 1993. This sentence is clearly supported by the record. The trial court did not abuse its discretion.

### CONCLUSION

The trial court properly admitted the evidence of statistical probability of Faught as the rapist based upon DNA comparisons. The issue of the sufficiency of the evidence to support a conviction is properly before this Court. There was sufficient evidence to support the conviction. The sentence imposed is supported by the record. The decisions of the trial court are affirmed.

McDEVITT, C.J., and Justices JOHNSON, TROUT and SILAK, JJ., concur.