980 P.2d 552

STATE of Idaho, Plaintiff–Respondent,

v.

Rudolfo TREVINO, III, Defendant–Appellant.

No. 24115.

Supreme Court of Idaho,
Twin Falls, March 1999 Term.

May 20, 1999.

Rehearing Denied July 9, 1999.

Crabtree & Carlson, Twin Falls, for appellant. Michael R. Crabtree argued.

Hon. Alan G. Lance, Attorney General; Kenneth W. Robins, Deputy Attorney General, Boise, for respondent. Kenneth W. Robins argued.

WALTERS, Justice.

Rudolfo Trevino III appeals from the judgment of conviction and life sentence imposed for first degree murder. The sentence included an enhancement for the use of a firearm and a minimum term of confinement of thirty-five years. I.C. §§ 19–2520; 19–2513. For the reasons stated below, we affirm.

### FACTS

In the early morning hours of May 14, 1995, the three male occupants of a Suzuki Sidekick shouted at the two men in a pickup truck that was backing into their path in the parking lot of the Circle K Store on Washington Street in Twin Falls, Idaho. The driver of the Suzuki got out of his vehicle and approached the pickup. The driver of the pickup, Larry Curtis, pulled forward out of the lot and into the road. The driver of the Suzuki got back into his vehicle and followed the pickup. He immediately pulled up onto the driver's side of the pickup, where fighting words were exchanged by the men in the two vehicles. Both drivers stopped their vehicles and the passenger in the pickup, Ryan Wiggins, got out, as did the passenger seated in the back seat of the Suzuki. The two started

throwing punches. The fight began behind the pickup and ended up across the road in a barrow pit. The others remained in or near their vehicles and watched until, at some point, the driver of the Suzuki got out and joined the melee. He struck Wiggins twice on the head with an object (later determined to be a sawed-off shotgun with the stock missing), causing Wiggins to slump down against a barbed wire fence. The man then fired a shot into Wiggins' chest. Curtis watched the men run back to the Suzuki, jump in and leave the scene. Wiggins lay dying from the shotgun blast.

Wiggins was eighteen years old. He and Curtis were returning home from a bachelor party for Curtis when they stopped at the Circle K to buy some snacks and cigarettes.

Curtis called 911 for emergency help, but Wiggins died. Curtis reported the license plate number of the Suzuki to the police. The vehicle was registered to Rudy Trevino. The gun was found later on the day of the shooting, along the road, together with several shotgun shells. There were no fingerprints on the weapon or the shells. Shotgun shells of the same brand, gauge and shot size as those found with the weapon were subsequently seized from Trevino's house under a search warrant. At trial, Tito Cantu, the man who first fought with Wiggins, identified the gun as belonging to Trevino.

## PROCEDURAL HISTORY

A magistrate's special inquiry into the death of Ryan Wiggins was conducted pursuant to I.C. §§ 19–1116—19-1123 to further the investigation in the case and compel material witnesses to give testimony. Two witnesses, Adan "Tito" Cantu and Clifford Velasquez, testified at the special inquiry in August of 1995 and said that they were not present when Wiggins was killed and that they were not involved in the incident. These witnesses later changed their stories and admitted being with the defendant, Rudy Trevino, the night of May 14, 1995, when the shooting occurred. They named Trevino as the owner and driver of the Suzuki. In March, 1996, Cantu led police to a canyon where the Suzuki, which Trevino had reported in the meantime as stolen, had been disposed of. Thereafter, Trevino was charged with first degree murder with the use of a firearm in the death of Ryan Wiggins.

The criminal complaint charging Trevino was filed on March 12, 1996, and counsel was appointed to represent him. At the preliminary hearing on March 22, 1996, defense counsel was provided with a partial list of witnesses and a partial transcript of the magistrate's special inquiry that was under a protective order. Trevino was bound over to the district court for trial, and an information dated April 2, 1996, was filed. Pretrial motions were submitted and resolved by the court.

In January of 1997, a status conference was held where a conflict of interest regarding defense counsel came to light. The district court granted the defense attorney's motion to be allowed to withdraw as counsel for Trevino. Substitute counsel was appointed on Trevino's behalf, and the trial was continued to May of 1997.

Defense counsel filed a motion for admission of the results of a polygraph exam taken by Trevino on April 23, 1997, based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The motion was denied. The district court also denied a defense motion to suppress the identification of Trevino by the eyewitness, Larry Curtis, asserted on the ground that the identification was tainted by suggestiveness arising from a photographic lineup and "showup" conducted by the investigating officers during the day following the shooting. Cantu and Velasquez also testified at the trial, and Trevino took the stand in his own defense. He was found guilty by the jury of murder in the first degree and of the use of a firearm in the commission of the murder. The district court entered a judgment of conviction and sentenced Trevino to the custody of the Board of Correction for the balance of his life, with a fixed term of twenty-seven years plus a consecutive, fixed term of eight years for the use of a firearm, during which time Trevino would not be allowed to be released on parole. Trevino appeals.

## ISSUES

Trevino raises the following issues on appeal.

1. Were the lineup and showup so impermissibly suggestive and tainted as to invalidate the subsequent identifications?

2. Should Idaho courts hold *Daubert* hearings regarding polygraph examinations?

3. Was the admission of testimony from Cantu's lawyer regarding Cantu's motives for turning state's evidence, and the limiting instruction regarding this testimony, in error?

4. Should the court have given an involuntary manslaughter instruction?

5. Did the court err in admitting the expert's testimony about injuries that would be consistent with firing of the murder weapon when no firing of the gun had been conducted?

6. Is the life sentence with thirty-five years determinate excessive in this case?

## ANALYSIS

### I.

■ In determining whether to suppress an in-court identification that has allegedly been unduly tainted by an out-of-court identification, a trial court must decide whether the out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification. Trevino argues that the pretrial identification was the result of improper police procedures and should have been suppressed.

■ Due process requires the exclusion of identification evidence if police suggestiveness created a substantial risk of mistaken identification, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *State v. Alger*, 115 Idaho 42, 44, 764 P.2d 119, 121 (Ct.App.1988), except where the reliability of the identification is sufficient to outweigh the corrupting effect of the suggestive identification. *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140, 148–49 (1977); *State v. Hoisington*, 104 Idaho 153, 162, 657 P.2d 17, 25 (1983). The question of whether improper suggestiveness exists is determined from a totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 196, 93 S.Ct. 375, 380, 34 L.Ed.2d 401, 409 (1972). *See also Hoisington, supra.*

At the police station during the day following the early morning shooting of Ryan Wiggins, Curtis was shown a photographic lineup containing the pictures of several men. Curtis was given a written advisory statement indicating that he should not conclude or guess that the photographs contained the picture of the person who committed the crime. However, when Curtis asked whether photos of all three men at the crime scene were in the lineup, Detective Heidemann informed Curtis that only the shooter was in the photo lineup. Curtis selected the photo of a man other than Trevino. After Curtis learned from Detective Heidemann that he had not picked Trevino's photo, Curtis was allowed to study the photos a while longer. Curtis did not change his selection from the photo array. The process involving the photographic lineup was videotaped, preserving it for review by the courts.

At the conclusion of the photographic lineup, but before Curtis left the station, Trevino showed up to report that his Suzuki had been stolen. Curtis recognized Trevino as the shooter after Trevino removed the hat he was wearing. Trevino claims that Curtis' identification of him later at the trial was tainted by suggestiveness arising from the lineup and Trevino's "showup" appearance at the police station.

In support of his argument, Trevino cites *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). In *Foster*, the identification was made after a second in-person lineup where the person selected was the only one who had appeared in both lineups. In Trevino's case, the photo of Trevino that was not selected by the witness had been taken two years earlier and looked significantly different from Trevino as he appeared the day of the showup. The district judge, who viewed the videotape in the proceeding to decide Trevino's motion to suppress the identification, rejected Trevino's contention that Detective Heidemann had tapped on the photo of Trevino after Curtis made his choice but before the one-man

showup. In addition, the district court found that any suggestions by Detective Heidemann had no effect on Curtis, who did not change his mind about the photo lineup.

■ Trevino contests the reliability of the identification, which is governed by the factors set out in *Manson v. Brathwaite, supra.* These factors include:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification.

*Id.* at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. Trevino argues that the effect of alcohol consumed by Curtis at his bachelor party, the exhibition and firing of a weapon and the fact that his best friend was beaten and shot affected Curtis' powers of observation at the crime scene. He also points to Curtis' complete failure to notice an especially unusual event that took place at the scene when the prosthetic arm worn by Cantu, one of the fighters, came off, and he had to retrieve it.

Applying a totality of the circumstances test, the district court properly found that the out-of-court identification did not violate Trevino's due process rights. The district court found that Curtis' opportunity to observe the shooter was probably minimal, but the situation was very intense, at a very close proximity to the witness, and commanded a high degree of attention from the witness. The district court noted that there were issues of lighting and that Curtis had just come from a bachelor party where he had consumed alcohol, but that Curtis's physical description of Trevino was not inaccurate. Finally, the district court found that the showup took place between twelve and fifteen hours after the shooting, which was not an unreasonable delay that could have distorted the witness' recall.

Trevino challenges Curtis's description of the shooter, disagreeing with the district court that it was accurate, in part, because he was not readily able to identify Trevino in a one-on-one showup until Trevino removed his hat. Curtis identified Trevino only with reservation, commenting that the shooter had cut his hair since the shooting. Such a comment does not mean that Curtis's description was inaccurate and may indicate a detail that supports his identification of Trevino.

We find any suggestiveness in the conduct of the photo lineup was too subtle to be meaningful. Thus, we affirm the district court's conclusion that the lineup procedures were not so suggestive as to taint the subsequent identification of Trevino by Curtis. We also affirm the admission of the identification which, as the district court found, was marked by indicia of reliability.

## II.

■ Trevino argues that *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), should be read to guarantee a criminal defendant a hearing for the court to rule on the admissibility and the reliability of polygraph evidence. He contends that the district court erred in denying his motion to admit the results of his polygraph exam on that basis.

In *Daubert,* the Supreme Court held that the "general acceptance in the scientific community"[1] standard for determining the admissibility of scientific evidence had been replaced by the Federal Rules of Evidence, in particular F.R.E. 702. The *Daubert* court held that pursuant to Rule 702, the trial judge is assigned the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Daubert,* at 598–99, 113 S.Ct. at 2799, 125 L.Ed.2d at 485–86. In other words, for scientific evidence to be admitted, it must be supported by appropriate validation, establishing a standard of evidentiary reliability, and must assist the trier of fact to understand the evidence or to determine a fact in issue. *Id.* at 590–91, 113 S.Ct. at 2795, 125 L.Ed.2d at 480–81. The decision to admit or deny the evidence, therefore, is within the discretion of the trial judge in individual jurisdictions which may reasonably reach dif-

---

1. *See Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923).

fering conclusions as to whether polygraph evidence should be admitted. *See United States v. Scheffer*, 523 U.S. 303, ——, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413, 419 (1998).

In denying admission of the polygraph results, the district judge addressed in part the concerns of *Daubert* when he reasoned that the polygraph in this case does not go to help the jury find facts but goes to substitute the jury's credibility-finding mechanism with physiological responses and their interpretation by psychologists. The district court did not address the question of reliability of polygraph results as trial evidence nor whether polygraph evidence should be excluded as more prejudicial than probative under Rule 403. *See United States v. Call*, 129 F.3d 1402 (10th Cir.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998). The district court did not admit the polygraph results, relying on *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989), *cert. denied* 493 U.S. 917, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989), where this Court held the results of polygraph examinations inadmissible absent a stipulation by both parties, regardless of whether the polygraph testimony is exculpatory. *Fain*, 116 Idaho at 86–87, 774 P.2d at 256–57 (citations omitted). Under *Scheffer*, where the decision to admit polygraph evidence is left up to the individual jurisdictions, we hold that the district court acted within its discretion in rejecting the proposed use of the polygraph in this case and in ruling the polygraph results inadmissible.

### III.

■■■ Trevino contends that the district court erred in admitting evidence of statements Tito Cantu made to his attorney, Raymundo Pena, which Trevino characterized as hearsay. The prosecution offered Pena's testimony to rebut the claim made during the defense's cross-examination of Cantu, that Cantu had recently fabricated his trial testimony. Defense counsel cast doubt on Cantu's testimony by arguing that Cantu had recently fabricated his testimony only to gain the advantages of a plea bargain agreement

he had entered into with the state. The prosecution sought to rehabilitate its witness, Cantu, by calling Pena to testify about the motive behind Cantu turning state's evidence and testifying at Trevino's trial.

Defense counsel objected to the admission of Pena's testimony on the ground that the plea agreement spoke for itself, and a hearing was held outside the presence of the jury. Over counsel's objections and following an offer of proof regarding the substance of Pena's proposed testimony, the district court ruled Pena's testimony admissible, with an instruction limiting its use, for two reasons: (1) under I.R.E. 803(3), as an exception to hearsay, and (2) under I.R.E. 801(d)(1)(B), as a prior consistent statement offered to rebut a charge of recent fabrication or improper influence or motive.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. I.R.E. 801(c). The objectionable testimony from Pena disclosed that Cantu had expressed his feeling of guilt when he told Pena that he was having trouble sleeping; he wanted to get this matter off his conscience; that he was having nightmares, cold sweats, and kept reliving the incident over and over in his head and needed to tell somebody. Because the statement sought to prove the matter asserted—Cantu's motive—the admission of the testimony is deemed hearsay and cannot be sustained under I.R.E. 803(3).[2]

Trevino disputes that Pena's testimony of Cantu's out-of-court statement spelling out his motive for turning state's evidence was a prior consistent statement. A statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is consistent with declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. I.R.E. 801(d)(1)(B). Here, as is obvious from a review of the trial testimony, Cantu never stated that the reason he was willing to testify against Trevino was because of the feelings of guilt that were weighing on him

2. Trevino does not argue that the evidence was irrelevant, nor does he challenge the district court's I.R.E. 403 analysis.

and taking their toll on him. Thus, the statement cannot be construed as a prior consistent statement which preceded any motive on the part of Cantu to lie. The admission of Pena's testimony into evidence, therefore, was error.

■ Not every error in the admission of evidence, however, requires a reversal of the the trial proceeding. Idaho Criminal Rule 52 provides that: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." In order to determine if the error affected Trevino's substantial rights or was harmless, we must inquire whether it appears, beyond a reasonable doubt, that there was no reasonable possibility that the error contributed to Trevino's conviction. *State v. Roy,* 127 Idaho 228, 231, 899 P.2d 441, 444 (1995). We conclude that the error was harmless in view of the other incriminating evidence against Trevino provided by witnesses other than Cantu whose testimony was improperly bolstered by Pena's testimony, such as the evidence from the expert matching the wounds on Trevino's hands to the gun; Cliff Velasquez' testimony placing Trevino at the scene; the eyewitness testimony from Curtis identifying Trevino as the shooter and his identification of Trevino; and the shells found in Trevino's home that were like those found with the gun used to kill Wiggins.

### IV.

■ Trevino argues that his proposed instruction listing lesser included offenses should have been given to the jury. He maintains that the lesser included offense of involuntary manslaughter was improperly excised from the instruction in that the case arguably dealt with the operation of a firearm in a reckless, careless or negligent manner, which conduct resulted in death.

■ We exercise free review of the trial court's refusal to give the manslaughter instruction requested by the defense as a lesser included offense. *State v. Thompson,* 101 Idaho 430, 614 P.2d 970 (1980). If the district court finds that there is a reasonable view of the evidence to support the requested instruction on a lesser included offense, the court is required to instruct on that lesser offense. *State v. Thomasson,* 122 Idaho 172, 832 P.2d 743 (1992). Here, the district court did not abuse its discretion in deciding it would be improper to give the jury an instruction on involuntary manslaughter as a lesser offense of first degree murder. The evidence showed that the shooter backed up after hitting Wiggins twice on the head with the weapon and then fired the shot while holding the shotgun close to Wiggins' chest, and that the other man fighting with the victim had yelled, "No" when he saw Wiggins slump over after being struck on the head, before the shot was fired. An investigating officer testified that he tested the sawed-off shotgun and it took a concerted effort to make it discharge, it did not have a "hair trigger," and he could not get the gun to fire accidentally. There was, as the district court found, insufficient evidence to support the giving of an involuntary manslaughter instruction.

### V.

■ Trevino next raises a claim of error regarding the testimony of the expert witness, Doctor Kerry Patterson, M.D., which matched injuries to Trevino's hands to the physical characteristics of the murder weapon. Trevino's injuries—masserating or tearing lacerations and abrasions—appeared in photographs taken of his hands when he showed up at the police station to report the theft of his Suzuki. Trevino argues that without firing or otherwise testing the gun, Doctor Patterson should not have been allowed to tell the jury his opinion, which carried an aura of reliability.

■ The admissibility of expert opinion testimony is discretionary and will not be disturbed on appeal absent a showing of an abuse of discretion. *Burgess v. Salmon River Canal Co., Ltd.,* 127 Idaho 565, 903 P.2d 730 (1995); *State v. Parkinson,* 128 Idaho 29, 909 P.2d 647 (Ct.App.1996).

■ To give expert opinion testimony, a witness must first be qualified as an expert on the matter at hand. *State v. Rodgers,* 119 Idaho 1047, 812 P.2d 1208 (1991); *State v. Hopkins,* 113 Idaho 679, 747 P.2d 88 (Ct.App.

1987). Based on his experience with guns and extensive forensic pathology training, which included learning the types of injuries caused by weapons and courses to understand ballistics and modifications to guns, Doctor Patterson was adequately qualified as an expert. The record shows that Doctor Patterson examined the photos of Trevino's hands and the sawed-off shotgun that had a bobbed off hammer and with the stock retaining bolt exposed because the stock was missing. The record also shows that Doctor Patterson first described the modifications that had been made to the gun and then explained how Trevino's wounds to his hands were consistent with those modifications. He related in detail how Trevino's injuries could have been received from firing the gun with the described modifications.

We conclude that there was sufficient evidence to create the foundation necessary to allow Doctor Patterson to render his opinion testimony linking the gun modifications to the injuries on Trevino's hands. The weight to be accorded the expert's testimony, contrasted with any alternative explanations for Trevino's injuries, was a decision for the jury.

## VI.

▮▮▮ Lastly, Trevino contends that his sentence is excessive. The criteria for evaluating the length of a sentence are well known, and appellate review is based on an abuse of discretion standard. *State v. Wolfe,* 99 Idaho 382, 582 P.2d 728 (1978). Where an appellant contends that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record as it appears on the appeal, having regard for the nature of the offense, the character of the offender and the protection of the public interest. *State v. Reinke,* 103 Idaho 771, 653 P.2d 1183 (Ct.App.1982). In order to establish that a sentence imposed is unreasonable, the defendant must show in light of the governing criteria that the sentence is excessive under any reasonable view of the facts. *State v. Charboneau,* 124 Idaho 497, 499, 861 P.2d 67, 69 (1993); *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App. 1982).

First degree murder carries a maximum penalty of death, if aggravating circumstances are present. Without aggravating circumstances, the sentencing judge must impose a sentence of life, although it may be either an indeterminate life sentence or a fixed life sentence. I.C. § 18–4004; *State v. Wilson,* 107 Idaho 506, 690 P.2d 1338 (1984). Here, the sentencing judge imposed a life sentence and specified a minimum period of confinement for the murder of twenty-seven years, plus a consecutive, fixed term of eight years for the use of a firearm. We use the minimum period of thirty-five years which Trevino must serve before being eligible for parole consideration as the probable measure of confinement for the purpose of sentence review. *See State v. Book,* 127 Idaho 352, 354, 900 P.2d 1363, 1365 (1995); *State v. Kysar,* 116 Idaho 992, 783 P.2d 859 (1989).

Trevino was convicted after being arrested for murder when he was placed at the murder scene in his Suzuki Sidekick which he later dumped into a canyon and reported missing to conceal his involvement in the shooting. Trevino was found to have shot and killed the victim after interfering in a fistfight between the victim and Trevino's friend that began with verbal tauntings and badgering. Prior to shooting the victim, Trevino had struck him on the head with the gun he then used to shoot him at close range in the chest.

The district court deemed Trevino to be a remorseless killer because he offered no statement at the sentencing hearing and based upon the great lengths to which Trevino had gone to try to hide his crime. The district court concluded because of the depravity of the crime, his lack of remorse, and his prior acts of violence, that Trevino required correctional treatment. According to the district court, Trevino's conduct was random and senseless; and there was no need for a young man to lose his life due to Trevino's uncontrollable anger one night when both men were out with their friends and Trevino took a sawed-off shotgun to a fistfight.

In our view, the district judge expressed sound reasons for his sentencing decision.

He adverted to the criteria of protecting society, retribution and deterrence in committing Trevino to the custody of the Board of Correction. In sum, we conclude that the sentence was reasonable and not an abuse of the sentencing discretion vested in the district court.

## CONCLUSION

The judgment of conviction for first degree murder and the life sentence with a minimum term of confinement of thirty-five years are affirmed.

Justices SILAK and SCHROEDER concur.

TROUT, C.J., concurring in the result of Part II and concurring fully in the balance:

The Court holds that the trial court acted within its discretion when excluding the polygraph results. In support of this conclusion, the Court reasons: (1) that the trial court found that the polygraph results would not assist the jury in understanding a fact in issue, and (2) it properly relied on *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989). I agree that the trial court acted within its discretion for the first reason noted above. I write only to indicate my opinion that the *Fain* decision should not be read too broadly.

In *Fain* the Court also held that the trial court acted within its discretion when refusing to admit the results of a polygraph test. *Id.* at 86–87, 774 P.2d at 256–57. However, citing cases from a number of federal and state jurisdictions, the Court added:

The foregoing authorities reflect the prevailing judicial view that the physiological and psychological bases for the polygraph examination have not been sufficiently established to assure the validity or reliability of test results. While scientific developments may one day refine the polygraph examination so that the results of the test may more frequently merit admission into evidence, we will not now overturn the trial court's exclusion absent a stipulation by both parties.

*Id.* at 87, 774 P.2d at 257.

Moreover, I.R.E. 702, not *Fain* in particular, establishes the criteria for analyzing the admissibility of expert testimony concerning the results of a polygraph examination. *See State v. Faught*, 127 Idaho 873, 876, 908 P.2d 566, 569 (1995). Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Because technology is ever expanding, the case may one day arise where polygraph examinations have attained a sufficient degree of reliability. In such a case, a trial court should admit the results of that examination if they "will assist the trier of fact to understand the evidence or to determine a fact in issue."

Justice KIDWELL concurs.