**SHELTER MUTUAL INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**MID–CENTURY INSURANCE COMPANY; American Family Mutual Insurance Company; and Virginia Johnson, Defendants–Appellants.**

No. 07CA2063.

Colorado Court of Appeals,
Div. IV.

Dec. 11, 2008.

Certiorari Granted Aug. 31, 2009.

Light Harrington & Dawes, P.C., Steven J. Dawes, Sophia H. Tsai, Denver, CO, for Plaintiff–Appellee.

Wick & Trautwein, L.L.C., Robin L. Wick, Kimberly B. Schutt, Fort Collins, CO, for Defendant–Appellant Mid–Century Insurance Company.

Harris, Karstaedt, Jamison & Powers, P.C., Mark A. Sares, Heather A. Salg, Laura M. Martinez, Englewood, CO, for Defendants–Appellants American Family Mutual Insurance Company and Virginia Johnson.

Opinion by Judge WEBB.

In this automobile liability insurance coverage dispute, defendants, Mid–Century Insurance Company, Virginia Johnson, and American Family Mutual Insurance Company, her insurer, appeal the partial summary judgment in favor of plaintiff, Shelter Mutual Insurance Company, declaring the Mid–Century and Shelter insurance coverages co-primary and Shelter's "step-down" clause enforceable. We affirm as to co-primary coverage, reverse as to enforceability of the step-down clause, and remand for further proceedings on the bifurcated tort claims.

Johnson was injured in an accident involving a car owned by Bruce Brown, who is not a party, permissively driven by his son, Mark Brown, and insured by Shelter. The Shelter policy provided coverage of $50,000 per person or $100,000 per accident for bodily injury, and $50,000 for property damage. Mark Brown also had his own automobile insurance policy issued by Mid–Century, with coverage of $250,000 per person or $500,000 per accident for bodily injury, and $100,000 for property damage. Both policies contained competing "excess" clauses, also known as "other insurance" clauses, which make the respective coverages secondary to other collectible insurance.

The Shelter policy also contained a "step-down" clause that became effective when Bruce Brown renewed the policy shortly before the accident. This clause limited Shelter's liability "for persons who meet the definition of insured solely because they have permission or general consent to use the described auto ... [to] the minimum limits of

liability insurance coverages mandated by the financial responsibility law applicable to the accident." Thus, it capped Shelter's liability for permissive drivers at $25,000 per person or $50,000 per accident for bodily injury, and $50,000 for property damage. *See* § 10–4–620, C.R.S.2008. Before the renewal, permissive drivers had the same coverage as the named insured.

Shelter filed a declaratory judgment action seeking to compel Mid–Century to contribute on a co-primary basis until the limits of Shelter's coverage had been reached and to limit its obligation to the step-down clause. Mid–Century responded that Shelter's excess clause was unenforceable because it contravenes Colorado's compulsory liability insurance statute, section 10–4–619, C.R.S.2008, and that Shelter's step-down clause was unenforceable because Shelter had provided insufficient notice of the clause to Bruce Brown before the renewal. Johnson and American Family filed tort cross-claims against Mark Brown, but later stipulated to bifurcate the tort claims from the declaratory judgment claim for purposes of trial.

On cross-motions for summary judgment, the trial court ruled for Shelter on both issues and certified its ruling as final under C.R.C.P. 54(b).

### I. Summary Judgment Standard

■ We review a summary judgment de novo. *Brodeur v. Am. Home Assurance Co.,* 169 P.3d 139, 146 (Colo.2007). Summary judgment is appropriate only if the pleadings and supporting documents show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* The nonmoving party is entitled to the benefit of all favorable inferences reasonably drawn from the undisputed facts; all doubts must be resolved against the moving party. *Id.*

■ We review the interpretation of an insurance policy de novo and construe it according to principles of contract interpretation. *Hoang v. Assurance Co. of America,* 149 P.3d 798, 801 (Colo.2007). When interpreting a contract, we give effect to the intent and reasonable expectations of the parties. *Id.*

### II. Co–Primary Coverage

Mid–Century contends Shelter's excess clause is void because it erodes the mandate of section 10–4–619 that vehicle owners carry minimum liability insurance, and, alternatively, Shelter has primary coverage because its clause is not subject to dollar-for-dollar apportionment with other coverage under *Allstate Ins. Co. v. Avis Rent–A–Car System, Inc.,* 947 P.2d 341 (Colo.1997). We consider and reject each contention in turn.

### A. Mandatory Insurance Coverage Can Include an Excess Clause

Mid–Century's challenge to the excess clause in statutorily-mandated coverage exposes the tension between such coverage and the right of insureds and insurers to contract freely. *See generally Principal Mutual Life Ins. Co. v. Progressive Mountain Ins. Co.,* 1 P.3d 250, 255–56 (Colo.App.1999) (recognizing conflict between mandatory insurance coverage and freedom of contract), *aff'd,* 27 P.3d 343 (Colo.2001). Based on the Colorado insurance statutes, we conclude the latter prevails.

■ Statutory interpretation is a question of law subject to de novo review. *See, e.g., Reg'l Transp. Dist. v. Aurora Pub. Schs.,* 45 P.3d 781, 782 (Colo.App.2001). We seek to ascertain legislative intent, starting with the plain language of the statute and giving the words their ordinary meaning. *USA Tax Law Ctr., Inc. v. Office Warehouse Wholesale, LLC,* 160 P.3d 428, 431 (Colo.App. 2007). If that language is unambiguous, we look no further. *Id.*

■ Under section 10–4–619, "[e]very owner of a motor vehicle who operates the motor vehicle ... or who knowingly permits the operation of the motor vehicle ... shall have in full force and effect a complying policy · ...." § 10–4–619(1), C.R.S.2008. Owners who fail to comply are subject to sanctions under Colorado's Motor Vehicle Financial Responsibility Act. *Id.;* §§ 42–4–1409, 42–7–301, C.R.S.2008.

Mid–Century identifies no Colorado case or current Colorado statute, and we have found none, requiring that the owner's compulsory coverage be treated as primary. To the contrary, an owner's compulsory coverage "may be subject to conditions and exclusions that are not inconsistent with the requirements" of the statute. § 10–4–623(1), C.R.S.2008. Because section 10–4–623 imposes no other limitation, an excess clause could be such a condition or exclusion.

We are also informed by former section 10–4–707(4), which sunset with the No–Fault Act in 2003. Ch. 189, sec. 1, § 10–4–726, 2002 Colo. Sess. Laws 649. As to Personal Injury Protection (PIP) benefits, it provided:

> When an accident involves the operation of a motor vehicle by a person who is neither the owner of the motor vehicle ... nor an employee of the owner ... and the operator of the motor vehicle is an insured under a complying policy other than the complying policy insuring the motor vehicle involved in the accident, *primary coverage ... shall be afforded by the policy insuring the said operator* ... and any policy under which the owner is an insured shall afford excess coverage.

(Emphasis added.)

This section shows that the General Assembly knows how to identify primary insurance coverage. *See, e.g., Pueblo Bancorporation v. Lindoe, Inc.,* 63 P.3d 353, 362 (Colo. 2003) (finding use of fair market value damages measure in many statutes indicates General Assembly knew how to use phrase). Therefore, we will not read a primacy requirement into coverage mandated by section 10–4–619. *See Travelers Indemnity Co. v. Barnes,* 191 Colo. 278, 283, 552 P.2d 300, 304 (1976) (primacy scheme in former section 10–4–707(4) limited to PIP coverages, and would not be extended by implication to liability coverage).

After the No–Fault Act sunset, the General Assembly readopted and incorporated specific sections of the Act into the current fault system. *See, e.g.,* §§ 10–4–619,–621, C.R.S. 2008 (formerly §§ 10–4–705, –710, respectively). However, as indicated, no provision of the current scheme treats mandatory coverage as primary or prohibits excess clauses in

mandatory coverage. We cannot dismiss this omission by the General Assembly as inadvertent. *See Avis Rent–A–Car System, Inc. v. Allstate Ins. Co.,* 937 P.2d 802, 805 (Colo. App.1996) ("[T]he General Assembly has chosen not to address the primacy of liability coverage as it has that of PIP coverage ... we are hesitant to conclude that the excess clause in the Avis rental agreement is void as against any legislatively declared public policy. Such an argument is better addressed to the General Assembly."), *aff'd,* 947 P.2d 341 (Colo.1997).

Therefore, these enactments do not suggest that insureds and insurers are prohibited from determining by contract what coverages are primary and what coverages are excess as to compulsory coverage.

For the following reasons, we decline to join cases in other jurisdictions holding that an owner's compulsory insurance coverage is necessarily primary. *See Bowers v. Alamo Rent–A–Car, Inc.,* 88 Hawai'i 274, 965 P.2d 1274, 1277 n. 3 (1998) (collecting cases).

The *Bowers* court determined that Hawaii's financial responsibility law had not been satisfied "simply because there [was other] insurance available," reasoning that the owner is obligated to provide coverage and may not meet this duty by contractually shifting responsibility to the driver's insurer. *Id.* at 1279. To hold otherwise would "create a practical exemption to the broad statutory mandate that all automobile owners carry liability insurance...." *Id.* at 1278.

However, the *Bowers* rule is contrary to our supreme court's holding in *Allstate.* The court noted that section 10–4–705 (now codified at section 10–4–619) required Avis, as the vehicle's owner, to insure against property damage caused by its lessees. 947 P.2d at 343. In contrast, the lessee's property damage coverage for liability arising from operating a nonowned vehicle was optional. The rule adopted in *Bowers* would have made the Avis coverage primary. But as discussed in the next subsection, the court determined that the two coverages were co-primary. *Id.* at 344.

Additionally, we are informed by *Budget Rent A Car of St. Louis v. Guaranty Nat.*

*Ins. Co.,* 939 S.W.2d 412, 415 (Mo.Ct.App. 1996), which took the opposite view from *Bowers,* concluding that, absent a statute to the contrary, the parties were free to contract regarding the priority of coverage. The court explained that "[t]he purpose of [Missouri's financial responsibility] law is to protect accident victims, who have no concern as to whether coverage is primary or excess so long as there is coverage somewhere." *Id.*

The General Assembly has declared a similar purpose regarding Colorado's financial responsibility law:

> The general assembly is acutely aware of the toll in human suffering and loss of life, limb, and property caused by negligence in the operation of motor vehicles.... *[T]he general assembly is also very much concerned with the financial loss visited upon innocent accident victims by negligent motorists who are financially irresponsible....* [I]t is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists.

§ 42–7–102, C.R.S.2008 (emphasis added); *see Common Sense Alliance v. Davidson,* 995 P.2d 748, 755 (Colo.2000) ("One of the best guides to legislative purpose is an act's declaration of policy.").

Accident victims are equally protected by compulsory coverage that is primary or multiple coverages that are co-primary. Thus, we discern no need to abrogate the freedom of contract between insureds and insurers regarding primacy of coverages.

We are unpersuaded by Mid–Century's reference to delay in compensating accident victims while conflict between competing excess clauses is resolved. *See Allstate,* 947 P.2d at 346–47. Our decision resolves this uncertainty and thus prevents future delay. *See* C.A.R. 35(f) (court of appeals opinions "designated for official publication shall be followed as precedent by the trial judges of the state of Colorado.").

Nor are we persuaded by Mid–Century's citation to *Finizio v. Am. Hardware Mut. Ins. Co.,* 967 P.2d 188 (Colo.App.1998). There, a division of this court voided an "escape clause," whereby the insurer would provide no coverage if other insurance applied, as an "attempt to dilute, restrict, or condition the coverage required by the No–Fault Act." *Id.* at 190. But Shelter's excess clause only limits coverage to the extent other coverage exists.

Therefore, we conclude that Shelter's excess clause is not void as an erosion of the statutory mandate that vehicle owners carry minimum liability insurance.

### B. *Allstate* Applies to the Excess Clauses

*Allstate* held that because giving effect to competing excess clauses would destroy coverage, they are unenforceable as a matter of public policy, and both insurers must share the loss on a dollar-for-dollar basis until the limits of one policy have been exhausted. 947 P.2d at 344. The second policy then continues to pay up to its limits or until the loss is fully compensated. *Id.*

Here, as in *Allstate,* both the Mid–Century and Shelter policies contain competing excess clauses. Mid–Century's excess clause states, "Any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance." Shelter's excess clause provides, "If there is other insurance which covers the insured's liability with respect to a claim also covered by this policy, Coverages A and B of this policy will apply only as excess to such other insurance." Were we to give literal effect to both excess clauses, neither would cover the loss and an unintended consequence or absurdity contrary to public policy would result. *Id.* at 346.

Nevertheless, Mid–Century asks us to distinguish *Allstate* because the lessee purchased "additional" liability coverage from the car rental company, or, alternatively, to limit *Allstate* to its facts because the rental-car context is "unique," citing *State Farm Mut. Auto. Ins. Co. v. Hertz Claim Management Corp.,* 338 Ill.App.3d 712, 273 Ill.Dec. 507, 789 N.E.2d 407 (2003). We decline to do either.

In *Allstate*, the lessee had purchased liability insurance, including property damage, from Avis, the vehicle's owner, as part of the rental agreement, and also held her own policy, which included property damage. However, the *Allstate* court did not rely on the lessee's holding both policies in concluding that both insurers would share the loss. Hence, we decline to distinguish *Allstate* on this basis.

Nor are we persuaded to limit *Allstate* by Mid–Century's citation to *Hertz Claim Management Corp.*, 273 Ill.Dec. 507, 789 N.E.2d at 411, which held that precedent requiring the vehicle owner's coverage to be primary did not apply in the "unique context of rental cars" because a lessee has the choice of either accepting the term of the rental contract that the lessee's insurance will be primary or paying a higher charge for comparable coverage through the rental agency. The court explained that while this choice adequately protects the public, when a vehicle is loaned to a friend or relative the driver does not have a similar option and the owner cannot pass insurance costs on to the driver. *Id.*, 273 Ill.Dec. 507, 789 N.E.2d at 412.

Unlike *Allstate, Hertz* did not involve competing excess clauses. Further, the *Allstate* court did not mention the rationale articulated in *Hertz.* Hence, we decline to use it and read *Allstate* as restricted to rental cases.

Accordingly, we conclude that the trial court did not err in determining that the Mid–Century and Shelter excess clauses cancelled each other out, requiring both insurers to share the loss on a dollar-for-dollar basis until the limits of either policy were exhausted. Having so concluded, we need not address Mid–Century's argument that requiring coverage on the vehicle to be primary is the better rule. However, the dollar-for-dollar formula requires that we address the validity of Shelter's step-down clause.

### III. Sufficiency of Notice

Mid–Century next contends, joined by American Family and Johnson, that because Shelter did not adequately notify Bruce Brown regarding the reduction in coverage on renewal, the trial court erred in upholding Shelter's step-down clause. We agree.

■ Because the jurisdictional nature of standing requires a sua sponte inquiry, *People in Interest of J.C.S.*, 169 P.3d 240, 245 (Colo.App.2007), we requested supplemental briefs on whether any party other than Bruce Brown could challenge the step-down clause for inadequate notice to him.

■ Although Shelter now and for the first time argues that Mid–Century, American Family, and Johnson lack standing to raise inadequate notice, we conclude otherwise.

In *Constitution Assocs. v. New Hampshire Ins. Co.*, 930 P.2d 556, 558 (Colo.1996), the court recognized the trial court's discretion to permit "an anticipatory declaratory action" by an insurance company before any judgment had been entered against its insured, in which "the injured party ... may properly defend."

Here, Shelter named its permissive insured, Mark Brown, the injured party, Johnson, her insurer, American Family, and Mark Brown's insurer, Mid–Century. As in *Constitution Assocs.*, all of these parties were persons "interested under" Shelter's insurance contract with Bruce Brown. § 13–51–106, C.R.S.2008. Because the coverages of Shelter and Mid–Century were potentially co-primary, Mid–Century was "affected" by that contract, and thus, it is entitled to "have determined" the "validity" of the Shelter step-down clause based on the defense of Shelter's allegedly inadequate notice to Bruce Brown. If the injured party can defend under *Constitution Assocs.*, the insured party's insurer should also be allowed to do so.

Although *Constitution Assocs.* was not decided on standing grounds, the division cited it in *Continental W. Ins. Co. v. Jim's Hardwood Floor Co., Inc.*, 12 P.3d 824, 827 (Colo. App.2000), a declaratory judgment action brought by the tortfeasor's insurer to reform the policy and thereby negate coverage. The division held that "an injured party ... has standing to contend that Continental is estopped from asserting a claim for reformation" because the claim was not raised until after judgment had been entered in the un-

derlying action against the tortfeasor. *Continental*, 12 P.3d at 828.

Here, the inadequate notice defense is not personal to Bruce Brown because it rests on a form notice and language in the renewal policy, as discussed below. To that extent, we perceive it as similar to the estoppel defense raised by the injured party in *Continental*.

Further, we discern no prejudice to Bruce Brown from allowing the declaratory judgment claim to proceed before resolution of the tort claims because the coverage issues do not involve factual determinations that could affect his tort liability, if any, in some other case. *See Constitution Assocs.*, 930 P.2d at 562–63. We express no opinion on his indispensability under C.R.C.P. 19 in further proceedings on the pending tort claims against Mark Brown.

▆▆▆▆ In general, an insurer that seeks to restrict coverage must not only use clear and unequivocal language, but must also call such limiting conditions to the attention of the insured. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 307 (Colo. 2003); *Peters v. Boulder Ins. Agency, Inc.*, 829 P.2d 429, 433 (Colo.App.1991); *Sanchez v. Connecticut General Life Ins. Co.*, 681 P.2d 974, 977 (Colo.App.1984). This is especially so if the limitation first appears in a renewal policy, as here. *Tepe v. Rocky Mountain Hosp. and Medical Services*, 893 P.2d 1323, 1327–28 (Colo.App.1994); *see also* 2 *Couch on Ins.* § 29:42 (2008) ("Where there is a standardized contract and the insured and insurer are in unequal bargaining positions, any exceptions, limitations, or exclusions in the renewal policy that may vary from the original policy issued must clearly, conspicuously and unambiguously be called to the insured's attention, especially when there is reduction in coverage."). Thus, "[i]t is 'a long-standing general principle applicable to insurance policies that an insurance company is bound by greater coverage in an earlier policy when a renewal policy is issued but the insured is not notified of the specific reduction in coverage.'" *Tepe*, 893 P.2d at 1328 (quoting *Davis v. United Services Automobile Ass'n*, 223 Cal.App.3d 1322, 273 Cal. Rptr. 224, 230 (1990)).

Here, before the renewal date, Shelter sent Bruce Brown a "Notice of Automobile Policy Changes," that stated in its entirety:

When you pay this renewal premium, you will be issued our new Automobile Insurance Policy. You should take time to become familiar with its provisions and the responsibilities you have as a policyholder under this contract.

New definitions have been added to assist in policy coverage interpretation. The policy has been rearranged in some areas for ease of reading.

Some changes will affect coverage you now have and will require decisions on your part. You may want to discuss these items with your agent.

PLEASE NOTE—IF THE OWNER LISTED ON THE TITLE OF THE VEHICLE INSURED UNDER THIS POLICY IS NOT ONE OF THE NAMED INSUREDS LISTED ON THE DECLARATIONS PAGE, PLEASE CONTACT YOUR AGENT.

Thank you for selecting Shelter Insurance® as your insurance provider.

The Declarations page on the enclosed renewal policy continued to list the levels of coverage at $50,000 per person or $100,000 per accident for bodily injury, and $50,000 for property damage. Nevertheless, Shelter argues that Bruce Brown was sufficiently notified about the step-down limitation because it was expressed twice within the policy.

First, the definition of an insured includes:

(5) any individual who has permission or general consent to use the described auto. However, the limits of our liability for individuals who become insureds solely because of this subparagraph, will be the minimum limits of liability insurance coverage specified by the financial responsibility law applicable to the accident, regardless of the limits stated in the Declarations, and only those coverages required by such law will be provided unless a specific coverage specifically states otherwise.

Second, under "LIMIT OF OUR LIABILITY," the policy states:

The limit of liability for Coverages A and B will be the limits of liability which appear in the Declarations subject to the following limitations:

. . . .

(7) Regardless of the limit of liability shown in the Declarations, the limit of liability under Coverages A and B for persons who meet the definition of insured solely because they have permission or general consent to use the described auto, will be the minimum limits of liability insurance coverages mandated by the financial responsibility law applicable to the accident.

Viewing these policy provisions in combination with the notice, which Shelter urges us to do, we conclude as a matter of law that Shelter's actions were insufficient to "call [the] limiting conditions to the attention of the insured," *Cyprus,* 74 P.3d at 307; *Sanchez,* 681 P.2d at 977, for the following reasons.

First, Shelter's notice did not inform Bruce Brown that coverage had been reduced for permissive drivers or identify the sections or pages in the renewal policy where the changes could be found. At most, it alerted him to the bare fact that unspecified coverage had been changed and supplied him with the policy to search out the changes. *Tepe,* 893 P.2d at 1328–30 (insured inadequately notified of new exclusions because, although renewal policy excluded specific medical procedure at issue, accompanying list of plan changes did not exclude it).

Second, rather than stating by what amount coverage had been reduced for permissive drivers, the renewal policy stated only that Shelter's coverage would be for "the minimum limits of liability insurance coverages mandated by the financial responsibility law applicable to the accident." Referring insureds to a state law to determine the extent coverage has decreased does not call the reductions to the insured's attention, but rather mistakenly assumes that consumers know what coverages Colorado law requires. *Cf. Safeco Ins. Co. of America v. Robertson,* 994 P.2d 488, 490 (Colo.App.1999) ("consumers [ ] are not expected to be highly sophisticated in the art of reading insurance policies").

Third, the Declarations page on the renewal policy denoted no limitations on coverage for permissive drivers. Instead, it continued to list the same higher levels of coverage as the original policy.

To the extent that Shelter argues notice is a factual issue inappropriate for summary judgment, we note that by affidavit, Bruce Brown asserted that he was unaware of any reduction in coverage before the accident. The information provided to him by Shelter does not create a fact issue concerning the reasonableness of his assertion.

Accordingly, we conclude that the trial court erred in holding that Shelter's step-down clause was enforceable. Having so concluded, we need not address Mid–Century's contention that the step-down clause is an unenforceable restriction on statutorily-mandated coverage.

The summary judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

Judge ROY and Judge HAWTHORNE concur.